IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | | |
|---|---|---|
| FLOSPORTS, INC., | § | |
|     PLAINTIFF | § | |
| v. | § | CIVIL ACTION NO. 1:17-CV-01043-LY |
| | § | |
| WWN, INC., | § | |
|     DEFENDANT. | § | |

**PLAINTIFF FLOSPORTS, INC.'S RESPONSE TO WWN'S MOTION TO DISMISS**

Plaintiff FloSports, Inc. ("FloSports") hereby files this response to the Motion to Dismiss for Lack of Personal Jurisdiction, or in the Alternative, Motion to Dismiss for Failure to State a Claim (Clerk's Doc. 4) filed by Defendant WWN, Inc. ("WWN").

**INTRODUCTION**

1. WWN's CEO traveled to Texas and met with FloSports, a Texas-based corporation, to negotiate a contract for FloSports to advertise and internet stream WWN's wrestling events, including live events in Texas. WWN induced FloSports to enter this Exclusive Media Agreement ("the Agreement") by misrepresenting the number of fans purchasing viewership access to their events, and that representation and warranty was expressly incorporated into the parties' written contract. In fact, WWN contractually promised that "all data [it] provided . . . regarding financial performance of events [it] put on . . . was accurate, reliable and truthful."

2. WWN not only signed the Agreement in Austin, Texas, but also selected Texas law to govern the relationship.

3. FloSports paid hundreds of thousands of dollars to WWN in reliance on this promise. But WWN's data was false. When pressed for the data that backed up WWN's representations, WWN originally claimed the data was lost or deleted. Ultimately, WWN sent records listing subscribers more than once and including customers who had not purchased broadcast services.

Even accounting for that artificial inflation of its viewership, WWN's numbers proved far less than originally represented.

4.      WWN traveled to Texas, negotiated and executed the Agreement in Texas, returned to Texas to perform on the Agreement, entered into a five-year relationship with a Texas resident, and chose Texas law to govern the relationship.  WWN sent fraudulent data to FloSports in Texas and its CEO discussed that data while he was physically in Texas.  WWN has purposefully availed itself of the Texas forum and, because those contacts are directly related to FloSports' claims, the Court has personal jurisdiction over WWN.  WWN's untimely motion to dismiss should be denied.

## FACTS

5.      WWN hosts live wrestling events, charging consumers nationwide on pay-per-view and video-on-demand bases to view those events.  (Clerk's Doc. 4-1, *Hamaoui Dec*. ¶ 4.)  WWN began communicating with FloSports regarding a potential live-streaming and advertising agreement in August 2016.  (Ex. A, *Mergler Decl.*)  Through such an arrangement, WWN could gain greater visibility, accessibility, and advertising of its events and products from FloSports—a sports media company that offers direct-to-consumer subscriptions of its live internet broadcasts—in addition to receiving a steady stream of cash payments from FloSports.  (*Id.*)  During these conversations, WWN provided viewership data over the phone to FloSports and then, on October 11, 2016, emailed FloSports in Texas a detailed spreadsheet representing the number of customers that had purchased its broadcast services.  (*Id.;* Ex. B, *Email*.)

6.      Following two months of email and phone discussions, the parties agreed to meet in Texas in October 2016 to negotiate the terms of the deal.  (*Id.*)  WWN admits its President and CEO, Salem Hamaoui, traveled to Texas, where he "met with FloSports executives in Austin,

Texas and toured FloSports' office space," and "signed [the Agreement] that day in Texas." (Mot. at 3.) During the negotiations, the parties discussed the viewership data expressly, and FloSports relied upon those numbers to determine whether to enter the Agreement and the amount it would offer to pay for WWN's media rights. (Ex. A, *Mergler Decl.;* Ex. C, *Wendler Decl.*) They also drove by FloSports' potential new headquarters on Tillery Street in Austin, Texas, drove around Austin, and ate lunch in Austin. (Ex. A, *Mergler Decl.*)

7. Following these discussions, Hamaoui left the FloSports headquarters for San Antonio, where WWN was planning to produce an upcoming live event and where Hamaoui said he was planning to meet some friends. (*See id.;* Mot. at 3.) While en route, Hamaoui called FloSports and told its Vice President of Global Rights that he had discussed the deal with WWN executive Gabe Sapulsky and was ready to sign. (Ex. A, *Mergler Decl.*) Hamaoui turned his car around and came back to FloSports headquarters in Austin, where the Agreement was executed in person by both parties. (*Id.; see* Ex. D, *Agreement*.) After signing, Hamaoui and three other FloSports executives walked to a nearby Austin bar, Lustre Pearl, for a celebratory drink. (Ex. A, *Mergler Decl.*)

8. By the terms of the Agreement, FloSports would provide internet broadcasting and advertising services for WWN over a five-year period. (Ex. D, *Agreement*.) The Agreement's introduction recognized that FloSports was "a Corporation based in Texas with its principal place of business at 2922 East Cesar Chavez, Austin, Texas" (*id.* at 1)—which of course WWN knew, since its principal was standing in that office when he signed the Agreement. Its terms specified that FloSports would produce at least one FloFilm series per year on the WWN, would provide substantial advertising value each year on FloSports, and that FloSports would pay fees for the exclusive right to stream WWN's events. (*Id.* at ¶¶ 3, 6, 8, 12.) In exchange for

FloSports' fees and advertising spend, WWN warranted that "all data provided by [WWN] regarding past financial performance of events put on by [WWN] was accurate, reliable and truthful." (*Id.* at ¶ 10(c).)

9.    The parties agreed that "[t]his Agreement shall be governed by, and interpreted and enforced in accordance with, the laws of the State of Texas[.]" (*Id.* ¶ 12(f).)

10.   WWN had previously conducted at least seven live events in Texas in 2016. (S*ee* Ex. E *WWN Archives* ("The Biggest Party in Independent Wrestling heads to the Lone Star State!")).[1]  After executing the Agreement, WWN conducted two additional live events in Texas that were governed by the Agreement. (*See* Mot. at 3–4.)  Agents from FloSports and WWN were onsite in San Antonio, Texas for these events, which were held in January 2017.[2] (Ex. A,

---

[1] Though WWN claims it has held only five events in Texas in 13 years, its own website belies that claim.  It offers DVDs for sale of the following Texas events in 2016 alone:
- 4/1/2016 - Evolve 58 - Dallas, TX, *available at* http://wwnlive.com/product/evolve-58-blu-ray/?v=7516fd43adaa
- 4/1/2016 - WWN Experience - Combat Zone Wrestling, Dallas, Texas, http://wwnlive.com/product/czw-welcome-combat-zone/?v=7516fd43adaa
- 4/1/2016 - Kiaju Big Battel, Dallas, Texas, http://wwnlive.com/product/kaiju-big-battel-content-champions/?v=7516fd43adaa
- 4/2/2016 - Evolve 59- Dallas, Texas, http://wwnlive.com/product/evolve-59-blu-ray/?v=7516fd43adaa
- 4/2/2016 - WWN Experience - Shimmer Wrestling, Dallas, Texas, http://wwnlive.com/product/shimmer-volume-80-heart-shimmer-championship-tournament/?v=7516fd43adaa
- 4/2/2016 - WWN Mercury Rising Supershow, *available at* http://wwnlive.com/product/wwn-supershow-mercury-rising-2016-blu-ray/?v=7516fd43adaa

Its archived pages also announce an April 2016 "Authentic Texas BBQ Tailgate" Party held in Dallas.
https://web.archive.org/web/20160318155105/http://www.morethanmania.com/Main/main.html

[2] WWN offered tickets to these Texas events, Evolve 76 and Evolve 77, and promoted FloSports' live streaming of both events, on its interactive website.  *See* http://wwnlive.com/event/evolve-76-jan-27th-8pm-cst/?v=7516fd43adaa;

*(footnote continued to next page)*

*Wendler Decl.*)  FloSports streamed the two Texas events, and WWN's personnel, including Hamaoui, traveled to Texas for multiple days to produce them.  (*See id.*)  The parties planned additional live events for November 2017 in Houston, Texas, but FloSports' involvement in those events was canceled as a result of the parties' dispute.  (Ex. C, *Wendler Decl.*)  At the Texas events, WWN was required to perform its contractual duties, including managing and running the events' video production, delivering the live-stream feed to FloSports, arranging onsite display space to FloSports, providing PA announcements regarding FloSports' streaming, and displaying signage every hour promoting the live streaming on FloSports.  (Ex. D, *Agreement* at ¶ 7.)

11. FloSports performed its advertising, streaming, and contractual services from its headquarters in Austin, Texas.  (Ex. C, *Wendler Decl.*)  No Flosports agent traveled to Florida for the negotiations or execution of the Agreement.  (*Id.; see* Ex. A, *Mengler Decl.*)

12. When FloSports discovered that WWN's viewership data was false, it filed suit in state court on September 15, 2017.  (*See* Clerk's Doc. 1 Ex. C, *Pet.*)  After multiple attempts to serve WWN at its purported Florida "headquarters" proved unsuccessful, it served WWN through the Texas Secretary of State on October 16, 2017.  (Clerk's Doc. 1, *Removal*.)  WWN removed the action on November 3, 2017.  (*Id.*)[3]

---

*(footnote continued from previous page)*
http://wwnlive.com/event/evolve-77-jan-28th-2pm-cst/?v=7516fd43adaa ("Watch the live stream & VOD at www.FloSlam.tv!").

[3] WWN's responsive pleading was therefore due November 10, 2017.  FED. R. CIV. P. 81(c). WWN did not answer on November 10, but filed its motion to dismiss on November 13, 2017. (Clerk's Doc. 4.)

## ARGUMENT & AUTHORITIES

### I. Motion Standard

13. Texas's long-arm statute specifies that a nonresident corporation is subject to jurisdiction in Texas when it "contracts by mail or otherwise with a Texas resident and either party is to perform the contract in whole or in part in this state." TEX. CIV. PRAC. & REM. CODE §§ 17.041–.42. The parties agree that the long-arm statute extends to the federal constitutional limits, such that a Court may exercise personal jurisdiction over a nonresident defendant if the defendant has "minimum contacts with the forum state, and (2) subjecting the nonresident to jurisdiction [is] consistent with traditional notions of fair play and substantial justice." *Freudensprung v. Offshore Tech. Servs., Inc.*, 379 F.3d 327, 343 (5th Cir. 2004) (internal quotations and citations omitted); *see* Mot. at 6.  When jurisdictional facts are disputed, all conflicts are resolved in favor of the party seeking to invoke the court's jurisdiction. *Paz v. Brush Engineered Materials, Inc.*, 445 F.3d 809, 813 (5th Cir. 2006).

14. FloSports' claims relate to WWN's contacts with Texas, so this response focuses on specific jurisdiction. Specific jurisdiction is established when a defendant's contacts with the forum state "arise from, or are directly related to the cause of action." *Wilson v. Belin*, 20 F.3d 644, 647 (5th Cir. 1994). "A corporation is a distinct legal entity that can act only through its agents[.] As such, a corporation can purposefully avail itself of a forum by directing its agents or distributors to take action there." *Daimler AG v. Bauman*, 134 S. Ct. 746, 759 (2014); *see Gold Kist, Inc. v. Baskin-Robbins Ice Cream Co.*, 623 F.2d 375, 380 (5th Cir. 1980) (finding personal jurisdiction based on visits by a corporation's agents to forum state). "A single act by a defendant can be enough to confer personal jurisdiction if that act gives rise to the claim being asserted." *Lewis v. Fresne*, 252 F.3d 352 (5th Cir. 2001).

### II. WWN's purposeful contacts in Texas give rise to the contract claim.

15. WWN waived its defenses in the motion to dismiss by not filing by the responsive-pleading deadline. *See* FED. R. CIV. P. 81. Regardless, WWN's purposeful and ongoing contacts in Texas are sufficient to subject it to personal jurisdiction here, and fair play and justice are served by allowing suit to proceed in this forum.

#### A. WWN knowingly entered an ongoing business relationship with a Texas resident.

16. A defendant is subject to personal jurisdiction when it "entered into an ongoing business relationship with a Texas resident (and his company) and made multiple trips and phone calls to Texas in furtherance of that relationship." *Latshaw v. Johnston*, 167 F.3d 208, 213 (5th Cir. 1999), *cited in Cantex Energy Corp. v. World Stock Exch., LLC*, CIV SA-09-CA-0218-XR, 2009 WL 2407959, at *7 (W.D. Tex. Aug. 4, 2009) (finding personal jurisdiction because "contracts required ongoing contacts between [defendant] and [plaintiff] in Texas").

17. After two months of discussions between WWN and FloSports, WWN's President and CEO, Salem Hamaoui, traveled to Texas. (Ex. A, *Mergler Decl.;* Mot. at 3.) There, he met with FloSports executives, toured FloSports' current headquarters, visited the future (now actual) FloSports headquarters, negotiated the Agreement's terms, and executed the Agreement. (*Id.*) The parties' Agreement was for a ***five-year business relationship*** that required ongoing performance by both parties and yearly payments. (*See* Ex. D, *Agreement*). Their deal was for regular live events—including several events in Texas, two of which took place before the dispute arose. (*See* Ex. C, *Wendler Decl.*) Hamaoui traveled to Texas to conduct these very events. (Mot. at 3; *Id.* at 4.) Regular email and phone communications from WWN to FloSports in Texas began before, and continued after, Hamaoui's visits, including communications for the

purpose of negotiating and executing the contract giving rise to this suit and discussions directly related to this dispute.  (Ex. C, *Wendler Decl.;* Ex. A, *Mergler Decl.*)

18.     The parties' relationship "was not that of a one-time customer, or an isolated contract," but of "a more continuous and long-term relationship involving several transactions."  *EMC Residential Mortg. Corp. v. Burrow Closing Mgmt. Corp.*, CIV.A.3:01CV1461-P, 2002 WL 180884, at *3 (N.D. Tex. Feb. 1, 2002).  Document review to date has revealed at least 368 emails sent from WWN to FloSports in Texas during the course of the parties' dealings, in addition to numerous text messages, several conference calls between the parties, and the in-person meetings.  (Ex. C, *Wendler Decl.*)

19.     Even where the parties' contractual choice of law was not Texas as it is here, the defendant was subject to personal jurisdiction where the parties' "relationship [] was, from the earliest stages, intended to be a lengthy one," the defendant's president made three trips to Texas, and there were "significant and ongoing contacts between the parties" during the contractual relationship.  *Solio Sec., Inc. v. Cummings Eng'g Consultants, Inc*., A-12-CA-722-SS, 2012 WL 13027556, at *4 (W.D. Tex. Oct. 2, 2012).  Likewise, in WWN's case, specific jurisdiction exists based on the ongoing contractual relationship and contacts alone.

### B.     WWN negotiated, executed, and performed the Agreement in Texas.

20.     It is undisputed that Agreement's negotiation and its execution occurred with both parties physically present in Texas.  WWN purposefully availed itself of its relationship with a Texas resident—not only by contracting with FloSports, but by negotiating and executing the contract *in Texas*.  This travel to Texas, for both negotiation and performance of the contract, itself constitutes sufficient purposeful availment with the forum state for purposes of FloSports' contract claim.  *Compare Southwind Capital Partners, LLC v. Burkman*, 1-15-CV-646 RP, 2016

WL 8258899, at *3 (W.D. Tex. Mar. 28, 2016) (finding minimum contacts based on remote negotiations and execution of contract).

21.   The parties' bilateral performance of the Agreement in Texas also independently provides sufficient contacts to subject WWN to this Court's jurisdiction.  Both parties' contractual activities at the January 2017 live events took place in Texas.  WWN's obligations under the Agreement took place onsite in San Antonio, Texas, for these events, and WWN's personnel, including its CEO, were physically present in Texas for them.  WWN executive Gabe Sapolsky lives in the northeast, (*see* Ex. A, *Mergler Decl.*,) so his share of communications and contractual activity occurred outside of Florida as well.  WWN admits the payments under the Agreement came from FloSports, (Mot. at 4) in Texas.  Further, FloSports broadcasted and streamed WWN events from FloSports' Texas headquarters.  "All of these services required the work of [FloSports'] Texas-based employees, who performed their work in Texas."  *See MJCM, L.L.C. v. Sky Bank*, CIV.A. H-05-0664, 2005 WL 2121549, at *5 (S.D. Tex. Aug. 31, 2005) (denying dismissal for lack of personal jurisdiction).

22.   The fact that some performance also occurred in the multiple other states where other live events were held does not change the analysis.  In a diversity case, by definition, one party is typically a nonresident.  WWN traveled to Texas to negotiate the FloSports contract, then "entered into [this] contract[] that ***required ongoing work to be performed in Texas*** as well as in" the defendant's home state.  *See id.* at *6 (emphasis added).  It is "[t]he combination of these anticipated, long-term contacts, along with the contract's choice-of-law clause, [that] demonstrate sufficient minimum contacts for this Texas court to exercise specific personal jurisdiction over disputes arising out of the parties' agreements."  *Id.* (emphasis added).

23.     WWN's contacts with FloSports, a Texas resident, are neither unilateral nor random. WWN's physical presence in Texas and performance of contractual duties in Texas—all of which are relevant to the claims—distinguish this case from those WWN cites. *E.g. Holt Oil & Gas Corp. v. Harvey*, 801 F.2d 773, 778 (5th Cir. 1986) (noting defendant's contacts were limited to three checks defendant sent into Texas and remote communications with plaintiff in Texas), *cited at* Mot. 8, 9; *Hazim v. Schiel & Denver Book Pub.*, 647 Fed. App'x. 455, 459 (5th Cir. 2016) ("contract was between a Kansas resident and a United Kingdom entity and contemplated performance in the [UK] and Kansas;" noting no claim that defendant's "personnel ever traveled to Texas 'because of' the contract, or that the contract 'require[d] performance in Texas.'"); *Hydrokinetics, Inc. v. Alaska Mech., Inc.*, 700 F.2d 1026, 1029 (5th Cir. 1983) (contract chose Alaska law; "no performance by Alaska Mechanical was to take place in Texas").

24.     Even where a contract was performed almost exclusively in Florida, the court noted that:

> Defendants' contacts with Texas were not 'random,' 'fortuitous,' or 'attenuated.' Taking into account defendant's physical presence in Texas to negotiate the [] Agreements, the course of dealing between the two parties including a multitude of business communications defendants directed at Republic in Texas, and the language of the [] Agreements [which contained a Texas choice of law provision].

*Republic Capital Dev. Grp., L.L.C. v. A.G. Dev. Grp., Inc*., CIV.A. H-05-1714, 2005 WL 3465728, at *7 (S.D. Tex. Dec. 19, 2005) (internal citations omitted).  Because WWN negotiated, executed, and performed the contract while ***physically present in Texas***, WWN has the requisite minimum contacts.

### C. The Agreement's own terms show WWN's purposeful availment of Texas.

25. The parties' contractual choice of Texas law confirms that WWN's availment of Texas was neither incidental nor fortuitous. The Fifth Circuit recognizes that a party's choice of law impacts the minimum-contacts analysis. *E.g. Freudensprung v. Offshore Technical Servs., Inc.,* 379 F. 3d 327, 345 (5th Cir. 2004); *Central Freight Lines Inc. v. APA Transport Corp.*, 322 F.3d 376, 383 (5th Cir. 2003). In *Central Freight,* the defendants' contacts with Texas were far less extensive than WWN's:

> (1) Defendant sent two representatives to Texas to meet at plaintiff's Texas headquarters;
>
> (2) The Texas meeting "led the parties to negotiate and enter into" the contract;
>
> (3) Formal negotiations occurred remotely via telephone and written correspondence between the parties' respective headquarters.
>
> (4) Performance of the contract required accepting shipments from Texas for Texas customers.

*Id.* at 382. Nonetheless, the Fifth Circuit upheld personal jurisdiction over the defendant.

26. The court did so despite the fact that the contract there ***lacked*** "a choice of law clause, or some other provision that could have put [the defendant] on specific notice that it might be amenable to suit in Texas," stating that "neither does the Agreement contain any provision that would give [defendant] reason to think that it could ***not*** be haled into court in Texas in the event that [defendant] allegedly breached its agreement . . . ." *Id.* at 383 (citations omitted; emphasis in original). The court noted these contacts were not "random," and concluded that:

> Under any highly realistic and non-mechanical understanding of the [] Agreement, its negotiations, and its future consequences for the parties' business relationship, it is clear that [the defendant] purposefully directed its in-state and out-of-state activities at a resident of the forum (namely, [plaintiff]) with the aim of establishing a long-term association with that resident and with the foreseeable and intended result of causing economic activity within the forum state.

*Id.* (internal quotations omitted).

27. The "decision to enter a long-term contract with a Texas business entity and agreement that Texas law would govern that contract, although not dispositive, weighs in favor of finding minimum contacts." *MJCM, L.L.C.*, 2005 WL 2121549, at *5; *accord Southwind Cap. Ptrs., LLC v. Burkman*, 2016 WL 8258899 (W.D. Tex. 2016). Here, WWN purposefully chose Texas law to govern its long-term contract with a Texas resident, when it negotiated and signed the Agreement in Austin, Texas.

28. In stark contrast, *Moncrief,* which WWN relies upon, has the opposite fact pattern: rather than choosing Texas as the place of its negotiations and choice of law, "all the agreements were executed in Russia, with a Russian corporation, concerning a Russian joint venture, to develop a Russian gas field. Further, the [] Agreement provided for arbitration in Russia, under Russian law." *Moncrief Oil Intern. Inc. v. Oao Gazprom*, 481 F. 3d 309, 312 (5th Circuit 2007).

29. Even where "the defendant refrained from physically entering the forum state" (which is not true in this case) the defendant is subject to personal jurisdiction where it negotiated a contract remotely with the plaintiff's Texas representatives with the "intent of creating a long-term relationship"—particularly because the defendant was "put on notice that it could be amenable to suit in Texas" from the contract's choice of Texas law. *Goodman Co., L.P. v. A & H Supply, Inc*., 396 F. Supp. 2d 766, 773 (S.D. Tex. 2005). As in those cases, WWN was put on notice that it would be amenable to suit in Texas when it chose Texas law to govern the relationship.

30. Personal jurisdiction over WWN for the contract claim is not a close call. The relevant pattern of contacts WWN has in Texas include (1) physically entering the forum state (2) to negotiate *and* consummate the contract (3) which chose Texas's as the governing law; (4) while

contemplating an ongoing business relationship with a Texas resident (5) that would (and did) require performance by both parties in Texas.  The Fifth Circuit has consistently held that *various subsets* of these elements establish personal jurisdiction over a defendant.  Here, *all five elements* are present; this Court has personal jurisdiction over WWN.

### III. WWN has made purposeful contacts in Texas that give rise to the fraud and fraudulent-inducement claim.

31. This Court has specific jurisdiction over FloSports' fraud claims because WWN knowingly made fraudulent communications to FloSports in the forum state.[4]  A single telephone call and mailing of fraudulent materials into the forum state is sufficient for personal jurisdiction over a fraud claim.  See *Lewis v. Fresne*, 252 F.3d 352, 358-59 (5th Cir. 2001).  The Fifth Circuit has made clear that, "[w]hen the actual content of communications with a forum gives rise to intentional tort causes of action, this alone constitutes purposeful availment." *Id.* at 359.  Here, WWN directed multiple fraudulent communications into Texas, through emailed spreadsheets, email communications, in-person discussions in Austin, and phone calls into the forum.

32. Plaintiff's fraudulent-inducement claim is based on the actual content of communications that WWN purposefully directed toward a Texas company in Texas.  Personal jurisdiction exists where a plaintiff alleges that that the defendant:

> knew and intended that [plaintiff], a Texas resident, would rely on the information it provided via email and phone conversations to enter into an ongoing business relationship with [defendant], and

---

[4] In light of evidence showing that WWN induced FloSports to execute the Agreement using knowingly false information, FloSports has filed an amended pleading in this Court for fraudulent inducement rather than negligent misrepresentation.  WWN's basis for its motion to dismiss for failure to state a claim is rendered moot by the amendment.  *See Yumilicious Franchise, L.L.C. v. Barrie*, 819 F.3d 170, 177–78 (5th Cir. 2016) (reasoning under Texas law that independent-injury requirement applies to negligent-misrepresentation claims but not to fraudulent inducement).

> that the communications would have an effect in Texas, and thus [defendants] could foresee that they would be hauled into court in Texas based on those purposeful contacts with the forum.

*Cantex Energy Corp.*, 2009 WL 2407959, at *5. Like the defendant in *Cantex*, WWN sent the false viewership data to FloSports in Texas, intending that FloSports would enter into the Agreement in reliance on this false information. (*See Complaint*.) In this case, the fraudulent data was discussed ***in person in Austin, Texas,*** as well. (*See* Ex. A, *Mergler Decl.*) The Court has specific jurisdiction over the fraudulent-inducement claim.

### IV.    Fair play and substantial justice require litigation in Texas.

33.     WWN's relationship with Texas is substantial, related to the claims against it, and is intentional. With FloSports having satisfied the *prima facie* case, WWN had the burden to prove that "the balance of interest factors show that the exercise of jurisdiction would be unreasonable," and it has not done so. *See Pervasive Software, Inc. v. Lexware GmbH & Co. KG*, 688 F.3d 214, 222 (5th Cir. 2012). WWN's purposeful availment of Texas's forum through its interactive website and multi-state live events reveal its nationwide presence, and forecloses its argument that litigating outside of Florida would be an undue burden. WWN is doing business in Texas by creating repeated and purposeful interactions with Texas businesses and residents, suggesting there is no surprise that it would be subject to jurisdiction here. WWN presents no evidence that litigation here would be particularly burdensome. *See Next Techs., Inc. v. ThermoGenisis, LLC,* A-15-CV-00225-LY-ML, 2015 WL 6554421, at *7 (W.D. Tex. Oct. 28, 2015)*, report and recommendation adopted*, 2015 WL 12670888 (W.D. Tex. Nov. 24, 2015) ("While Defendants have identified burdens incident to litigation in a Texas forum, these burdens (travel, adherence to state substantive law for common law claims, adherence to state evidentiary rules regarding privileges, decisions by Texas jurors) are at most, an inconvenience

which would be equally felt by forcing the Plaintiff to litigate in [Florida].") (internal quotations omitted).

34.     FloSports is based in Texas and WWN in Florida.  "As is often the case in diversity suits, the nonresident defendant undoubtedly faces some burden if subjected to the jurisdiction of the forum state."  *Solio Sec., Inc.*, 2012 WL 13027556, at *4 ("Whether Texas is the most efficient forum is not the question.").  But personal jurisdiction over the parties exists in one state or the other—and Texas is the state (1) in which WWN chose to negotiate and execute the Agreement; (2) in which WWN chose to hold live events under the Agreement; (3) that the parties elected as its choice of law for any future disputes; and (4) to which WWN directed its false communications.  WWN is not a small local business, but a national corporation conducting an online business through agents and even an executive who lives beyond Florida's borders.  WWN chose to enter into an ongoing relationship with a Texas corporation through a five-year contract and has provided no evidence that litigating here is unduly burdensome or unjust.

35.     WWN cannot meet the burden of preventing this Court's jurisdiction over it based on its complaints regarding fairness.  Its purposeful availment of the forum justifies jurisdiction here.

                              Respectfully submitted,

**RICHARDSON + BURGESS LLP**
221 West 6th Street, Suite 900
Austin, Texas  78701-3445
Telephone: (512) 482-8808
Facsimile: (512) 499-8886
Email: kburgess@richardsonburgess.com
Email: ssharp@richardsonburgess.com

Dated: November 27, 2017        By:  */s/ Karen C. Burgess*
                                        Karen C. Burgess
                                        State Bar No. 00796276
                                        Stacy Rogers Sharp
                                        State Bar No. 24052109

                **ATTORNEYS FOR PLAINTIFF**
                **FLOSPORTS, INC.**

## CERTIFICATE OF SERVICE

This is to certify that a copy of the foregoing document was served on the attorneys of record in accordance with the Federal Rules of Civil Procedure on this the 27th day of November, 2017, as follows:

Paul Schlaud
State Bar No. 24013469
Manasi Rodgers
State Bar No. 24090361
Reeves & Brightwell LLP
221 W 6th Street, Suite 1000
Austin, Texas 78701-3418
Telephone: (512) 334-4500
Facsimile: (512) 334-4492
Email: pschlaud@reevesbrightwell.com
Email: mrodgers@reevesbrightwell.com

                                                              */s/ Karen C. Burgess*
                                                              Karen C. Burgess