IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | | |
|---|---|---|
| FLOSPORTS, INC., | § | |
|     PLAINTIFF | § | |
| v. | § | CIVIL ACTION NO. 1:17-CV-01043-LY |
| | § | |
| WWN, INC., | § | |
|     DEFENDANT. | § | |

**PLAINTIFF FLOSPORTS, INC.'S RESPONSE TO WWN'S MOTION TO DISMISS**

Plaintiff FloSports, Inc. ("FloSports") hereby files this response to the Motion to Dismiss for Lack of Personal Jurisdiction (Clerk's Doc. 13) filed by Defendant WWN, Inc. ("WWN").

## INTRODUCTION

1. WWN's CEO traveled to Austin, Texas and met with FloSports, a Texas-based corporation, to negotiate a contract for FloSports to advertise and internet stream WWN's wrestling events, including live events in Texas.

2. WWN induced FloSports to enter this Exclusive Media Agreement ("the Agreement") by misrepresenting the number of fans purchasing viewership access to their events, and that representation and warranty was expressly incorporated into the parties' written contract. In fact, WWN contractually promised that "all data [it] provided . . . regarding financial performance of events [it] put on . . . was accurate, reliable and truthful." FloSports paid hundreds of thousands of dollars to WWN in reliance on this promise. But WWN's data was false. When pressed for the data that backed up WWN's representations, WWN originally claimed the data was lost or deleted. Ultimately, WWN sent records listing subscribers more than once and including customers who had not purchased broadcast services. Even accounting for that artificial inflation of its viewership, WWN's numbers proved far less than originally represented.

3. WWN entered into a five-year relationship with a Texas resident and chose Texas law to govern that relationship. It traveled to Texas, negotiated and executed the Agreement in Texas, and returned to Texas to perform on the Agreement. WWN sent fraudulent data to FloSports in Texas and its CEO discussed that data while he was physically in Texas. WWN has purposefully availed itself of the Texas forum and, because those contacts are directly related to FloSports' claims, the Court has personal jurisdiction over WWN. WWN's motion to dismiss should be denied.

## FACTS

4. WWN hosts live wrestling events, charging consumers nationwide on pay-per-view and video-on-demand bases to view those events. (Clerk's Doc. 13-1, *Hamaoui Dec*. ¶ 4.) WWN began communicating with FloSports regarding a potential live-streaming and advertising agreement in August 2016. (Ex. A, *Mergler Decl.*) Through such an arrangement, WWN could gain greater visibility, accessibility, and advertising of its events and products from FloSports—a sports media company that offers direct-to-consumer subscriptions of its live internet broadcasts. WWN was also interested in the deal because of the steady stream of cash payments it would receive from FloSports. (*Id.*) During these conversations, WWN provided viewership data over the phone to FloSports and then, on October 11, 2016, emailed FloSports in Texas a detailed spreadsheet representing the number of customers that had purchased its broadcast services. (*Id.;* Ex. B, *Email*.)

5. Following two months of email and phone discussions, the parties agreed to meet in Texas in October 2016 to negotiate the deal's terms. (*Id.*) WWN admits its President and CEO, Salem Hamaoui, traveled to Texas, where he "met with FloSports executives in Austin, Texas and toured FloSports' office space," and "signed [the Agreement] that day in Texas." (Mot. at 3.)

During the negotiations, the parties discussed the viewership data expressly, and FloSports relied upon those numbers to determine whether to enter the Agreement and the amount it would offer to pay for WWN's media rights. (Ex. A, *Mergler Decl.;* Ex. C, *Wendler Decl.*) They also drove by FloSports' potential new headquarters on Tillery Street in Austin, drove around Austin, and ate lunch in Austin. (Ex. A, *Mergler Decl.*)

6. Following these discussions, Hamaoui left the FloSports headquarters for San Antonio, where WWN was planning to produce an upcoming live event and where Hamaoui said he was planning to meet some friends. (*See id.;* Mot. at 3.) While en route, Hamaoui called FloSports and told its Vice President of Global Rights that he had discussed the deal with WWN executive Gabe Sapolsky, who lives in Massachussetts, and was ready to sign. (Ex. A, *Mergler Decl.;* Clerk's Doc. 13-1, *Hamaoui Dec.* ¶ 15.) Hamaoui turned his car around and came back to FloSports headquarters in Austin, where the Agreement was executed in person by both parties. (*Id.; see* Ex. D, *Agreement*.) After signing, Hamaoui and three other FloSports executives walked to a nearby Austin bar, Lustre Pearl, for a celebratory drink. (Ex. A, *Mergler Decl.*)

7. By the terms of the Agreement, FloSports would provide internet broadcasting and advertising services for WWN over a five-year period. (Ex. D, *Agreement*.) The Agreement's introduction recognized that FloSports was "a Corporation based in Texas with its principal place of business at 2922 East Cesar Chavez, Austin, Texas" (*id.* at 1)—which of course WWN knew, since its principal was standing in that office when he signed the Agreement. Its terms specified that FloSports would produce at least one FloFilm series per year on the WWN, would provide substantial advertising value each year on FloSports' site, and that FloSports would pay fees for the exclusive right to stream WWN's events. (*Id.* at ¶¶ 3, 6, 8, 12.) In exchange for FloSports' fees and advertising spend, WWN warranted that "all data provided by [WWN] regarding past

financial performance of events put on by [WWN] was accurate, reliable and truthful." (*Id.* at ¶ 10(c).)

8. The parties agreed that "[t]his Agreement shall be governed by, and interpreted and enforced in accordance with, the laws of the State of Texas[.]" (*Id.* ¶ 12(f).)

9. WWN had previously conducted or sponsored at least seven live events in Texas in 2016. (S*ee* Ex. E *WWN Archives* ("The Biggest Party in Independent Wrestling heads to the Lone Star State!")).[1] After executing the Agreement, WWN conducted two additional live events in Texas that were governed by the Agreement. (*See* Mot. at 3–4; Clerk's Doc. 13-1, *Hamaoui Dec.* at ¶ 29.) Agents from FloSports and WWN were onsite in San Antonio, Texas for these events, which were held in January 2017.[2] (Ex. A, *Wendler Decl.*) FloSports streamed the two Texas

---

[1] Though WWN claims it has held only five events in Texas in 13 years, its own website offers DVDs for sale of the following Texas events from 2016 alone:
- 4/1/2016 - Evolve 58 - Dallas, TX, *available at* http://wwnlive.com/product/evolve-58-blu-ray/?v=7516fd43adaa
- 4/1/2016 - WWN Experience - Combat Zone Wrestling, Dallas, Texas, http://wwnlive.com/product/czw-welcome-combat-zone/?v=7516fd43adaa
- 4/1/2016 - Kiaju Big Battel, Dallas, Texas, http://wwnlive.com/product/kaiju-big-battel-content-champions/?v=7516fd43adaa
- 4/2/2016 - Evolve 59- Dallas, Texas, http://wwnlive.com/product/evolve-59-blu-ray/?v=7516fd43adaa
- 4/2/2016 - WWN Experience - Shimmer Wrestling, Dallas, Texas, http://wwnlive.com/product/shimmer-volume-80-heart-shimmer-championship-tournament/?v=7516fd43adaa
- 4/2/2016 - WWN Mercury Rising Supershow, *available at* http://wwnlive.com/product/wwn-supershow-mercury-rising-2016-blu-ray/?v=7516fd43adaa

Its archived pages also announce an April 2016 "Authentic Texas BBQ Tailgate" Party held in Dallas. https://web.archive.org/web/20160318155105/http://www.morethanmania.com/Main/main.html

[2] WWN offered tickets to these Texas events, Evolve 76 and Evolve 77, and promoted FloSports' live streaming of both events, on its interactive website. *See* http://wwnlive.com/event/evolve-76-jan-27th-8pm-cst/?v=7516fd43adaa; http://wwnlive.com/event/evolve-77-jan-28th-2pm-cst/?v=7516fd43adaa ("Watch the live stream & VOD at www.FloSlam.tv!").

events, and WWN's personnel, including Hamaoui, traveled to Texas for multiple days to produce them. (*See id*.) The parties planned additional live events for November 2017 in Houston, Texas, but FloSports' involvement in those events was canceled as a result of the parties' dispute. (Ex. C, *Wendler Decl.*) At the Texas events, WWN was required to perform its contractual duties, including managing and running the events' video production, delivering the live-stream feed to FloSports, arranging onsite display space to FloSports, providing PA announcements regarding FloSports' streaming, and displaying signage every hour promoting the live streaming on FloSports. (*See* Ex. D, *Agreement* at ¶ 7.)

10. FloSports performed its advertising, streaming, and contractual services from its headquarters in Austin, Texas. (Ex. C, *Wendler Decl.*) No Flosports agent traveled to Florida for the negotiations or execution of the Agreement. (*Id.; see* Ex. A, *Mengler Decl.*)

11. When FloSports discovered that WWN's viewership data was false, it filed suit in state court on September 15, 2017. (*See* Clerk's Doc. 1 Ex. C, *Pet.*) After multiple attempts to serve WWN at its purported Florida "headquarters" proved unsuccessful, it served WWN through the Texas Secretary of State on October 16, 2017. (Clerk's Doc. 1, *Removal*.) WWN removed the action on November 3, 2017. (*Id.*)

## ARGUMENT & AUTHORITIES

### I. Motion Standard

12. Texas's long-arm statute specifies that a nonresident corporation is subject to jurisdiction in Texas when it "contracts by mail or otherwise with a Texas resident and either party is to perform the contract in whole or in part in this state." TEX. CIV. PRAC. & REM. CODE §§ 17.041–.042. The parties agree that the long-arm statute extends to the federal constitutional limits, such that a Court may exercise personal jurisdiction over a nonresident defendant if the

defendant has "minimum contacts with the forum state, and (2) subjecting the nonresident to jurisdiction [is] consistent with traditional notions of fair play and substantial justice." *Freudensprung v. Offshore Tech. Servs., Inc.*, 379 F.3d 327, 343 (5th Cir. 2004) (internal quotations and citations omitted); *see* Mot. at 5. When jurisdictional facts are disputed, all conflicts are resolved in favor of the party seeking to invoke the court's jurisdiction. *Paz v. Brush Engineered Materials, Inc.*, 445 F.3d 809, 813 (5th Cir. 2006).

13. FloSports' claims relate to WWN's contacts with Texas, so this response focuses on specific jurisdiction. Specific jurisdiction is established when a defendant's contacts with the forum state "arise from, or are directly related to the cause of action." *Wilson v. Belin*, 20 F.3d 644, 647 (5th Cir. 1994). "A corporation is a distinct legal entity that can act only through its agents[.] As such, a corporation can purposefully avail itself of a forum by directing its agents or distributors to take action there." *Daimler AG v. Bauman*, 134 S. Ct. 746, 759 (2014); *see Gold Kist, Inc. v. Baskin-Robbins Ice Cream Co.*, 623 F.2d 375, 380 (5th Cir. 1980) (finding personal jurisdiction based on visits by a corporation's agents to forum state). "A single act by a defendant can be enough to confer personal jurisdiction if that act gives rise to the claim being asserted." *Lewis v. Fresne*, 252 F.3d 352 (5th Cir. 2001).

## II.   WWN's purposeful contacts in Texas give rise to the contract claim.

14. WWN's purposeful and ongoing contacts in Texas are sufficient to subject it to personal jurisdiction in this forum, and fair play and justice are served by allowing the suit to proceed here.

### A.   WWN knowingly entered an ongoing business relationship with a Texas resident.

15. A defendant is subject to personal jurisdiction when it "entered into an ongoing business relationship with a Texas resident (and his company) and made multiple trips and phone calls to

Texas in furtherance of that relationship." *Latshaw v. Johnston*, 167 F.3d 208, 213 (5th Cir. 1999), *cited in Cantex Energy Corp. v. World Stock Exch., LLC*, CIV SA-09-CA-0218-XR, 2009 WL 2407959, at *7 (W.D. Tex. Aug. 4, 2009) (finding personal jurisdiction because "contracts required ongoing contacts between [defendant] and [plaintiff] in Texas").

16.     After two months of discussions between WWN and FloSports, WWN's President and CEO, Salem Hamaoui, traveled to Texas. (Ex. A, *Mergler Decl.;* Mot. at 3.) There, he met with FloSports executives, toured FloSports' current headquarters, visited the future (now actual) FloSports headquarters, negotiated the Agreement's terms, and executed the Agreement. (*Id.*) The parties' Agreement was for a ***five-year business relationship*** that required ongoing performance by both parties and yearly payments. (*See* Ex. D, *Agreement*). Their deal was for regular live events—including several events in Texas, two of which took place before the dispute arose. (*See* Ex. C, *Wendler Decl.*) Regular email and phone communications from WWN to FloSports in Texas began before, and continued after, Hamaoui's visits, including communications for the purpose of negotiating and executing the contract giving rise to this suit and discussions directly related to this dispute. (Ex. C, *Wendler Decl.;* Ex. A, *Mergler Decl.*)

17.     The parties' relationship "was not that of a one-time customer, or an isolated contract," but of "a more continuous and long-term relationship involving several transactions." *EMC Residential Mortg. Corp. v. Burrow Closing Mgmt. Corp.*, CIV.A.3:01CV1461-P, 2002 WL 180884, at *3 (N.D. Tex. Feb. 1, 2002). The contract required the production of FloFilms to promote WWN events, and three such films were produced in FloSports' Austin, Texas studios in collaboration with WWN. (Ex. F, *Supp. Wendler Decl.*) WWN also collaborated in Texas with FloSports regarding the production details of WWN live events (in Texas and beyond) and streaming from Austin, Texas. (*See* Ex. D, *Agreement;* Ex. C, *Wendler Decl.*) Not surprisingly,

document review to date has revealed at least 368 emails sent *from WWN to FloSports* in Texas during the course of the parties' dealings, in addition to voluminous text messages, several conference calls between the parties, and the in-person meetings. (*Id.*)

18. Even where the parties' contractual choice of law was not Texas as it is here, the defendant was subject to personal jurisdiction where the parties' "relationship [] was, from the earliest stages, intended to be a lengthy one" because of its two-year term. *Solio Sec., Inc. v. Cummings Eng'g Consultants, Inc.*, A-12-CA-722-SS, 2012 WL 13027556, at *4 (W.D. Tex. Oct. 2, 2012). WWN's attempt to distinguish *Solio* fails because, like the contract in *Solio*, the five-year Agreement at issue in this case involved "significant and ongoing contacts between the parties." *Id.* at *4. As in *Solio,* the president made trips to Texas, including one for in-person negotiations—and even, unlike *Solio*, a live event in Texas. *See id.* at *3–4. WWN's Agreement did more than "contemplate" a party's performance in Texas— it resulted in both parties actually performing their services in Texas, on an ongoing basis and during the Texas live events. WWN had reason to anticipate being haled into court in Texas based on its decision to *enter this ongoing contractual relationship that would, and did, result in its activities in Texas*. That purposeful availment alone is sufficient to subject WWN to personal jurisdiction.

### B. WWN negotiated, executed, and performed the Agreement in Texas.

19. WWN purposefully availed itself of Texas—not only by deciding to enter into the long-term relationship with a Texas resident, but by traveling to Texas to negotiate, execute, and perform the contract. WWN's presence in Texas at each of these stages of the contractual relationship itself constitutes sufficient purposeful availment of the forum state. *Compare Southwind Capital Partners, LLC v. Burkman*, 1-15-CV-646 RP, 2016 WL 8258899, at *3 (W.D.

Tex. Mar. 28, 2016) (finding minimum contacts based solely on remote negotiations, execution, and performance of contract).

20.     First, it is undisputed that the Agreement's negotiation and execution occurred with both parties physically present in Texas.  Second, the parties' bilateral performance of the Agreement in Texas also independently provides sufficient contacts to subject WWN to this Court's jurisdiction.  Both parties' contractual activities at the January 2017 live events took place in Texas.  WWN's obligations under the Agreement took place onsite in San Antonio, Texas, for these events, and WWN's personnel, including its CEO, were physically present in Texas for them.  WWN executive Gabe Sapolsky lives in Massachussetts, (*see* Ex. A, *Mergler Decl.*, Clerk's Doc. 13-1, *Hamaoui Dec.* ¶ 15,) so his share of communications and contractual activity occurred outside of Florida as well.  WWN admits the payments under the Agreement came from FloSports, (Mot. at 4) in Texas.  Further, FloSports broadcasted and streamed the WWN events from FloSports' Texas headquarters.  "All of these services required the work of [FloSports'] Texas-based employees, who performed their work in Texas." *See MJCM, L.L.C. v. Sky Bank*, CIV.A. H-05-0664, 2005 WL 2121549, at *5 (S.D. Tex. Aug. 31, 2005) (denying dismissal for lack of personal jurisdiction).  WWN's physical presence in Texas during these **multiple stages of the Agreement** distinguishes this case from any authority cited by WWN.  *E.g. John Perrott Enters., Inc. v. Kerstein*, SA99CA887DWS, 2000 WL 33348247, at *3 (W.D. Tex. Jan. 5, 2000), *cited in* Mot. at 10 (finding insufficient contacts where all material performance was in Mozambique and "all communications, saving one minor discussion" occurred outside of Texas).

21.     The parties agree that "the jurisdictional inquiry must focus on the relationship among the defendant, the forum, and the litigation." *Walden v. Fiore*, 134 S.Ct. 1115, 1121 (2014), *quoted in* Mot. at 8.  In *Walden,* a police officer seized the plaintiffs' funds in the Atlanta airport.  *Id.* at

1125. The plaintiffs then happened to fly to Nevada, and argued the officer was subject to jurisdiction there simply because "Nevada is where respondents chose to be at a time when they desired to use the funds seized." *Id.* The officer's contacts with Nevada were thus insufficient because he "never traveled to, conducted activities within, contacted anyone in, or sent anything or anyone to" the forum state. *Id.* Here, WWN did **all of those things**. This is not *Walden,* where the contacts were unilateral and limited to the plaintiff having simply experienced some injury in the forum state. *See id*. ("The proper question is not where the plaintiff experienced a particular injury or effect but whether the defendant's conduct connects him to the forum in a meaningful way.") It was WWN's own conduct that connected WWN to Texas.

22. The fact that some performance also occurred in the multiple other states where other live events were held does not change the analysis. In a diversity case, by definition, one party is typically a nonresident. WWN traveled to Texas to negotiate the FloSports contract, then "entered into [this] contract[] that **required ongoing work to be performed in Texas** as well as in" the defendant's home state. *See MJCM,* 2005 WL 2121549, at *6 (emphasis added). It is "[t]he combination of these anticipated, long-term contacts, along with the contract's choice-of-law clause, [that] demonstrate sufficient minimum contacts for this Texas court to exercise specific personal jurisdiction over disputes arising out of the parties' agreements." *Id.* (emphasis added).

23. WWN's contacts with FloSports, a Texas resident, were neither random nor a surprise. WWN's cited authority does not involve the repeated and purposeful physical presence in Texas that is seen here. *E.g. Holt Oil & Gas Corp. v. Harvey*, 801 F.2d 773, 778 (5th Cir. 1986) (noting defendant's contacts were limited to three checks defendant sent into Texas and remote communications with plaintiff in Texas); *Hazim v. Schiel & Denver Book Pub.*, 647 Fed. App'x.

455, 459 (5th Cir. 2016) (noting no claim that defendant's "personnel ever traveled to Texas 'because of' the contract, or that the contract 'require[d] performance in Texas.'"). Even where a contract was performed almost exclusively in Florida, the court concluded that the "contacts with Texas were not 'random,' 'fortuitous,' or 'attenuated,'" when "[t]aking into account defendant's physical presence in Texas to negotiate the [] Agreements, the course of dealing between the two parties including a multitude of business communications defendants directed at Republic in Texas, and the language of the [] Agreements," which contained a Texas choice of law provision. *Republic Capital Dev. Grp., L.L.C. v. A.G. Dev. Grp., Inc.*, CIV.A. H-05-1714, 2005 WL 3465728, at *7 (S.D. Tex. Dec. 19, 2005) (internal citations omitted). Because WWN negotiated, executed, and performed the contract while ***physically present in Texas***, WWN has the requisite minimum contacts.

### C. The Agreement's own terms show WWN's purposeful availment of Texas.

24. The parties' contractual choice of Texas law confirms that WWN's availment of Texas was neither incidental nor fortuitous. The Fifth Circuit recognizes that a party's choice of law impacts the minimum-contacts analysis. *E.g. Freudensprung v. Offshore Technical Servs., Inc.*, 379 F. 3d 327, 345 (5th Cir. 2004); *Central Freight Lines Inc. v. APA Transport Corp.*, 322 F.3d 376, 383 (5th Cir. 2003). In *Central Freight,* the defendants' contacts with Texas were far less extensive than WWN's:

(1) Defendant sent two representatives to Texas to meet at plaintiff's Texas headquarters;

(2) The Texas meeting "led the parties to negotiate and enter into" the contract;

(3) Formal negotiations occurred remotely via telephone and written correspondence between the parties' respective headquarters.

(4) Performance of the contract required accepting shipments from Texas for Texas customers.

*Id.* at 382.  Nonetheless, the Fifth Circuit upheld personal jurisdiction over the defendant.

25.     The court did so despite the fact that the contract there **lacked** "a choice of law clause, or some other provision that could have put [the defendant] on specific notice that it might be amenable to suit in Texas," stating that "neither does the Agreement contain any provision that would give [defendant] reason to think that it could ***not*** be haled into court in Texas in the event that [defendant] allegedly breached its agreement . . . ." *Id.* at 383 (citations omitted; emphasis in original).  The court noted these contacts were not "random," and concluded that:

> Under any highly realistic and non-mechanical understanding of the [] Agreement, its negotiations, and its future consequences for the parties' business relationship, it is clear that [the defendant] purposefully directed its in-state and out-of-state activities at a resident of the forum (namely, [plaintiff]) with the aim of establishing a long-term association with that resident and with the foreseeable and intended result of causing economic activity within the forum state.

*Id.* (internal quotations omitted).

26.     The "decision to enter a long-term contract with a Texas business entity and agreement that Texas law would govern that contract, although not dispositive, weighs in favor of finding minimum contacts."  *MJCM*, 2005 WL 2121549, at *5; *accord Southwind Capital Partners*, 2016 WL 8258899, at *3.  Here, WWN purposefully chose Texas law to govern its long-term contract with a Texas resident when it negotiated and signed the Agreement in Austin, Texas.

27.     In stark contrast, *Moncrief,* which WWN relies upon, has the opposite fact pattern:  rather than choosing Texas as the place of its negotiations and choice of law, "all the agreements were executed in Russia, with a Russian corporation, concerning a Russian joint venture, to develop a Russian gas field.  Further, the [] Agreement provided for arbitration in Russia, under Russian law." *Moncrief Oil Int'l Inc. v. Oao Gazprom*, 481 F. 3d 309, 312 (5th Cir. 2007).  Here, WWN's

choice of Texas law confirms that WWN "deliberately affiliated with the forum State." *Southwind Capital Partners*, 2016 WL 8258899, at *3.

28. Even where "the defendant refrained from physically entering the forum state" (which is not true in this case) the defendant is subject to personal jurisdiction where it negotiated a contract remotely with the plaintiff's Texas representatives with the "intent of creating a long-term relationship"—particularly because the defendant was "put on notice that it could be amenable to suit in Texas" from the contract's choice of Texas law. *Goodman Co., L.P. v. A & H Supply, Inc.*, 396 F. Supp. 2d 766, 773 (S.D. Tex. 2005). As in those cases, WWN was put on notice that it would be amenable to suit in Texas when it chose Texas law to govern the relationship.

29. Personal jurisdiction over WWN for the contract claim is not a close call. The relevant pattern of contacts WWN has in Texas include (1) physically entering the forum state (2) to negotiate *and* consummate the contract (3) which chose Texas's as the governing law; (4) while contemplating an ongoing business relationship with a Texas resident (5) that would (and did) require performance by both parties in Texas. The Fifth Circuit has consistently held that *various subsets* of these elements establish personal jurisdiction over a defendant. Here, *all five elements* are present, and since defendant's conduct in this state directly forms the basis for FloSports' contract claim, these minimum contacts justify exercise of personal jurisdiction.

> **III. WWN has made purposeful contacts in Texas that give rise to the fraud and fraudulent-inducement claim.**

30. This Court also has specific jurisdiction over FloSports' fraud claims because WWN knowingly made fraudulent communications to FloSports in the forum state. A single telephone call and mailing of fraudulent materials into the forum state is sufficient for personal jurisdiction over a fraud claim. See *Lewis v. Fresne*, 252 F.3d 352, 358-59 (5th Cir. 2001). The Fifth Circuit

has made clear that, "[w]hen the actual content of communications with a forum gives rise to intentional tort causes of action, this alone constitutes purposeful availment." *Id.* at 359.  Here, WWN directed multiple fraudulent communications into Texas, through emailed spreadsheets, email communications, in-person discussions in Austin, and phone calls into the forum.

31. Plaintiff's fraudulent-inducement claim is based on the actual content of communications that WWN made in Texas and purposefully directed toward a Texas company in Texas.  Personal jurisdiction exists where a plaintiff alleges that that the defendant:

> knew and intended that [plaintiff], a Texas resident, would rely on the information it provided via email and phone conversations to enter into an ongoing business relationship with [defendant], and that the communications would have an effect in Texas, and thus [defendants] could foresee that they would be haled into court in Texas based on those purposeful contacts with the forum.

*Cantex Energy Corp.*, 2009 WL 2407959, at *5.  Like the defendant in *Cantex*, WWN sent the false viewership data to FloSports in Texas, intending that FloSports would enter into the Agreement in reliance on this false information.  (*See Complaint*; Ex. B, *Emails*.)  In this case, the fraudulent data was discussed **in person in Austin, Texas,** as well.  (*See* Ex. A, *Mergler Decl.*)[3]  The Court has specific jurisdiction over the fraud claim.

### IV.  Fair play and substantial justice require litigation in Texas.

32. WWN's relationship with Texas is substantial, related to the claims against it, and is intentional.  With FloSports having satisfied the *prima facie* case, WWN had the burden to prove that "the balance of interest factors show that the exercise of jurisdiction would be unreasonable," and it has not done so.  *See Pervasive Software, Inc. v. Lexware GmbH & Co. KG*, 688 F.3d 214, 222 (5th Cir. 2012).  WWN's purposeful availment of Texas's forum through

---

3 To the extent Hamaoui's declaration regarding his recollection contradicts FloSports' evidence that the parties discussed the viewership data while in Texas, the facts should be viewed in FloSports' favor.  *Paz*, 445 F.3d at 813.

its interactive website and multi-state live events reveals its nationwide presence, and forecloses its argument that litigating outside of Florida would be an undue burden.  WWN is doing business in Texas by creating repeated and purposeful interactions with Texas businesses and residents and by traveling here to produce events; there can be no surprise that it would be subject to jurisdiction here.  And WWN presents no evidence that litigation here would be particularly burdensome.  *See Next Techs., Inc. v. ThermoGenisis, LLC,* A-15-CV-00225-LY-ML, 2015 WL 6554421, at *7 (W.D. Tex. Oct. 28, 2015)*, report & recommendation adopted*, 2015 WL 12670888 (W.D. Tex. Nov. 24, 2015) ("While Defendants have identified burdens incident to litigation in a Texas forum, these burdens (travel, adherence to state substantive law for common law claims, adherence to state evidentiary rules regarding privileges, decisions by Texas jurors) are at most, an inconvenience which would be equally felt by forcing the Plaintiff to litigate in [the Defendants' home state].") (internal quotations omitted).

33.     FloSports is based in Texas and WWN in Florida.  "As is often the case in diversity suits, the nonresident defendant undoubtedly faces some burden if subjected to the jurisdiction of the forum state." *Solio Sec., Inc.*, 2012 WL 13027556, at *4 ("Whether Texas is the most efficient forum is not the question.").  But personal jurisdiction over the parties exists in one state or the other—and Texas is the state (1) in which WWN chose to negotiate and execute the Agreement; (2) in which WWN chose to hold live events and collaborate on FloFilms under the Agreement; (3) that the parties elected as its choice of law for any future disputes; and (4) to which WWN directed its false communications.  WWN is not a small local business, but a national corporation conducting an online and live-event business through agents and even an executive who lives beyond Florida's borders.  (*See* Clerk's Doc. 13-1, *Hamaoui Dec*. at ¶ 15.)  In fact, WWN admits that its witnesses are not uniformly located in Florida.  (*Id.*)  WWN decided to enter into an

ongoing relationship with a Texas corporation through a five-year contract and has provided no evidence that litigating here is unduly burdensome or unjust.

34.     WWN cannot meet the burden of preventing this Court's jurisdiction over it based on its complaints regarding fairness.  Its purposeful availment of the forum justifies jurisdiction here.

                                                  Respectfully submitted,

                                                  **RICHARDSON + BURGESS LLP**
                                                  221 West 6th Street, Suite 900
                                                  Austin, Texas  78701-3445
                                                  Telephone: (512) 482-8808
                                                  Facsimile: (512) 499-8886
                                                  Email: kburgess@richardsonburgess.com
                                                  Email: ssharp@richardsonburgess.com

Dated: December 22, 2017                    By:  */s/ Karen C. Burgess*
                                                      Karen C. Burgess
                                                      State Bar No. 00796276
                                                      Stacy Rogers Sharp
                                                      State Bar No. 24052109

                                                **ATTORNEYS FOR PLAINTIFF**
                                                **FLOSPORTS, INC.**

**CERTIFICATE OF SERVICE**

      This is to certify that a copy of the foregoing document was served on the attorneys of record in accordance with the Federal Rules of Civil Procedure on this the 22nd day of December, 2017, as follows:

Paul Schlaud
State Bar No. 24013469
Manasi Rodgers
State Bar No. 24090361
Reeves & Brightwell LLP
221 W 6th Street, Suite 1000
Austin, Texas 78701-3418
Telephone: (512) 334-4500
Facsimile: (512) 334-4492
Email: pschlaud@reevesbrightwell.com
Email: mrodgers@reevesbrightwell.com

                                                    */s/ Karen C. Burgess*
                                                    Karen C. Burgess